IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL CASE NO. 1:13-CR-129-TWT-LTW |
| LEROY DEWAYNE WAGNER, | |
| Defendant. | |

**MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL**

Pending before this Court is Defendant's Motion to Suppress Evidence. Docket Entry [21]. This Court convened a suppression hearing on July 8, 2013, Docket Entry [30], after which Defendant submitted post-hearing briefs in support of his Motion to Suppress Evidence. Docket Entry [35]. The Government filed a response in opposition to Defendant's Motion to Suppress, to which Defendant replied. Docket Entries [37, 39]. Having considered Defendant's motions, the parties' briefs, and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence be **DENIED**. Docket Entry [21].

## BACKGROUND

On April 10, 2013, an indictment was filed against Defendant Leroy Dewayne Wagner (hereinafter "Defendant") charging him with unlawful distribution of a controlled substance in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and Title 18, United States Code, Section 2.

AO 72A
(Rev.8/82)

**1.     Task Force Officer Manning's Testimony**

In October 2012, the Georgia Drugs and Narcotic Agency ("GDNA") and the Drug Enforcement Agency ("DEA") jointly began an investigation into the diversion of large amounts of controlled substances, particularly Oxycodone. See Gov't's Ex. 1, p. 4). DEA Task Force Officer ("TFO") William Manning testified that Cecil Joseph, later identified as the Defendant, ordered tens of thousands of Oxycodone, Hydrocodone, and other drugs, through the Chamblee Pharmacy, a pharmacy that never opened. (Transcript of July 8, 2013 Suppression Hearing, hereinafter "Tr.", 7-8). The Chamblee Pharmacy was supposed to be located on Chamblee Dunwoody Road, in Dekalb County, Georgia. (Tr. 7). Every time GDNA attempted to inspect the location, it was closed. (Id.). When GDNA finally got into the location, it had been vacated. (Id.). None of the drugs ordered were ever used to fill prescriptions and all of the drugs ordered disappeared. (Id.).

Before the Chamblee Pharmacy closed, Defendant applied for a pharmacy license for Lillie RX, located at 510 Pleasant Hill Road in Lilburn, Georgia. (Tr. 9). On December 12, 2012, TFO Manning, Special Agent Margaret Brosh, and GDNA Assistant Director Dennis Troughton went to Lillie Pharmacy and met with Defendant Leroy Wagner. (Tr. 9-11, 48). The main objective of the investigation and meeting was to recover some of the controlled substances (i.e. Oxycodone and Hyrocodone) purchased for the Chamblee Pharmacy. (Tr. 12). During the meeting, Defendant was interviewed and asked to substantiate his living arrangements in the Atlanta area. (Tr.

2

24).  After the interview, GDNA and DEA's joint investigation led to the conclusion that the Defendant was the owner of the Chamblee Pharmacy and the individual applying for the license for Lillie RX.  (Tr. 11-12).

On April 10, 2013, after Defendant was indicted, a plan was made to arrest him. (Tr. 12).  Because Defendant was "somewhat elusive" and officers did not know where Defendant resided, a date was set for April 17, 2013, to meet with Defendant ostensibly to finalize the things that he needed to get his pharmacy license.  (Id.).  Although the plan was to arrest Defendant, in response to Defendant's calls seeking his pharmacy license, Special Agent Brosh sent Defendant a letter outlining documents Defendant needed to bring with him to get his pharmacy license for Lillie RX.  (Id.).

TFO Manning asked members of the Gwinnett [County] Sheriff's Department Fugitive Squad to assist him with surveillance.  (Tr. 13).  TFO Manning arrived sometime after 10:00 a.m. and found the shopping center where the pharmacy was located difficult to surveil because of surrounding businesses.  (Id.).  Because TFO Manning had to move around and there was a lot of activity in the shopping center, he did not see Defendant arrive.  (Tr. 14).  Sometime before 12:00 p.m., TFO Manning saw Defendant get out of his rental car from the driver's side and stand in front of the entrance to the pharmacy with Alonzo Craig, his attorney at the time.  (Tr. 13-16, 48). When the officers approached Defendant, he was twenty-five feet from his car, and not within reaching distance. (Tr. 15-16, 48).  TFO Manning approached Defendant and his attorney, shook their hands, and said "let's go inside."  (Tr. 15, 48).

3

Once inside the pharmacy, Defendant was placed under arrest and handcuffed. (Tr. 15). TFO Wagner searched Defendant and removed two cell phones, car keys, a lottery ticket, and a large amount of cash from him and placed it on the counter in the back of the pharmacy. (Tr. 16-17). TFO Manning took Defendant's cell phones and car keys, walked out of the pharmacy to go to his car which was parked almost behind Defendant's rental car, to put the cell phones into an evidence bag. (Tr.19). As a result of the police presence, a crowd was forming and there were a lot people just hanging around wanting to see what was happening. (Tr. 26). As TFO Manning approached Defendant's rental car, he could see a Louis Vuitton backpack in the front passenger seat of the car. (Tr. 26, 51). According to TFO Manning, the backpack was open and he could see there was paper in it but could not see what kind of paper. (Id.). TFO Manning pulled the door handle and the door was unlocked. (Id.). TFO Manning checked the keys that he had removed from Defendant and it opened, locked, and unlocked the car. (Id.). TFO Manning took the backpack, closed and secured Defendant's rental car, put the backpack into the back area of TFO Manning's car, secured the cell phones, and went back into the pharmacy. (Id.).

TFO Manning believed that he had probable cause to seize the backpack because he knew Defendant was supposed to be bringing documents with him such as documents verifying his residence. (Tr. 20, 24). Additionally, TFO Manning testified that the pharmacy investigation involved a substantial amount of forged documents, including forged documents from a business two doors down from Lillie RX. (Tr. 20-21). Thus,

4

TFO Manning believed that the backpack would contain forged documents and other documents that GDNA had asked Defendant to bring to the meeting. (Tr. 21). Another reason TFO Manning seized Defendant's Louis Vuitton backpack, which appeared to be real and may have been valued at $800, was because it was left in an unlocked car in a high crime area. (Tr. 24-25). TFO Manning was concerned that the backpack would be stolen from the rental vehicle because he had previously spent many hours doing surveillance in the area where the pharmacy was located and knew that drug and other crimes occurred there. (Tr. 25-26).

After seizing the backpack and placing it in his car, TFO Manning did not search the backpack at that time because he did not feel comfortable with the situation with the crowd and the presence of Defendant's then attorney. (Id.). TFO Manning just wanted to get Defendant and leave. (Id.). Five minutes elapsed from the time that TMO Manning left the pharmacy, approached Defendant's rental vehicle, seized the bag, put it into his car, and went back into the pharmacy. (Tr. 26-27). Defendant was arrested and transported in TFO Manning's car to Atlanta Pretrial Detention Center. (Tr. 27). TFO Manning did not search the rental car nor impound and inventory its contents. (Tr. 68-69). Instead, TFO Manning left the keys to the rental vehicle, Defendant's money, jewelry, and other items on the counter in the pharmacy with Defendant's attorney. (Tr. 27, 69).

On arrival at the Atlanta Pretrial Detention Center, as TFO Manning was taking Defendant out of the car, Defendant said "Oh, I see you've got my bag." (Tr. 28). After

5

Defendant was booked into the jail, TFO Manning inventoried the contents of the backpack as required by DEA policy. (Tr. 28). Pursuant to DEA policy:

> Inventory searches shall be made of all containers, whether locked or unlocked, that are lawfully seized for safekeeping. All items shall be inventoried on a DEA-12, Receipt for Cash or Other items, and the details of the inventory shall be reported in the DEA-6 that reports the related law enforcement activity.

(Tr. 29-30; Gov't.'s Ex. 1). TFO Manning's inventory search produced several items, including but not limited to, a Blackberry cellular telephone, an Apple iPhone, Apple iPad, a Verbatim 4 gigabyte storage device, and forty-one pieces of mail. (Tr. 33-34; Govt's Ex. 2, 3).

TFO Manning admitted that he did not complete a DEA-12 after his inventory search, but he did put the contents into a DEA-6 and then deposited the evidence later on a DEA-7A, which is used for submission of evidence DEA, and is a substitute for a DEA-12. (Tr. 30). In accordance with DEA policy, TFO Manning reported details of the inventory and the related enforcement activity in his DEA-6. (Tr. 30; Gov't's Ex. 2).

After the inventory search of Defendant's backpack was completed, TFO Manning secured the bag in a DEA safe, and did not take it out until April 30, 2013, when he put it into the evidence or property room. (Tr. 30, 34). TFO Manning did not pull the bag out again until May 15, 2013, when he executed a search warrant that he obtained on May 8, 2013. (Tr. 34-35).

### 2.     **Defendant Leroy Wagner's Testimony**

Defendant's version of events differs. Defendant Wagner testified that he had a Louis Vuitton backpack and a big matching Louis Vuitton duffle carry-on bag in the rental car which was a Chevy Equinox. (Tr. 77-78). According to the Defendant, the Chevy Equinox does not have a trunk and his duffle bag was directly behind the back seat in plain view. (Tr. 78). In contrast to TFO Manning's testimony, Defendant testified that he placed his backpack on the floor beneath the front passenger seat, moved the front seat up, exited the vehicle, and immediately locked it. (Tr. 79). Defendant also denies that he had the keys to the rental car on his person. (Id.). Instead, Defendant asserts that he placed them on the counter/computer table in the pharmacy. (Tr. 79-80). Defendant did not see anyone retrieve the keys or go into the rental car, and did not give anyone permission to do so. (Tr. 80). Defendant's attorney returned the rental car and his wife retrieved the duffle bag from the car. (Id.).

### **LEGAL ANALYSIS**

Defendant argues the warrantless seizure and search of his Luis Vuitton backpack from inside his rental vehicle was not legally justified. Specifically, Defendant contends that his backpack and evidence obtained from it should be suppressed because the warrantless search and seizure of the bag was not justified by the DEA's inventory policy. In support, Defendant theorizes that the seizure and search of his backpack was seized for evidentiary purposes and not lawfully seized for safekeeping, and its subsequent inventory without a warrant was illegal and not based on probable cause.

7

The Government argues in response that seizure of Defendant's backpack was lawful for three reasons: (1) the search and seizure of Defendant's backpack was justified by the automobile exception because TFO Manning had probable cause to believe the backpack contained evidence, instrumentalities, or fruits of some crime; (2) the search was a proper search incident to an arrest because it was reasonable for TFO Manning to believe that the backpack contained evidence of the offense for which Defendant had been arrested moments earlier; and (3) the expensive backpack was visible in plain view from outside the unlocked vehicle parked in an unsafe neighborhood.

### A.     The Automobile Exception

The Fourth Amendment provides that: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. While it is true that the Fourth Amendment generally requires law enforcement officials to obtain a warrant before conducting a search, there is what has become known as the automobile exception to the warrant requirement.

The automobile exception to the warrant requirement was based initially on a car's ready mobility and the exigent circumstances created by that mobility. See Carroll v. United States, 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In Carroll, the Supreme Court recognized that the automobile presented unique issues to law enforcement because officers might not have the opportunity to obtain a warrant without

8

losing sight of the car and because the car might escape if not stopped immediately. Id. Indeed, language in early Supreme Court cases appeared to require such an exigency in addition to probable cause for a warrantless search of an automobile. See Coolidge, 403 U.S. at 478, 91 S.Ct. 2022 (noting that, even where there is probable cause to search an automobile, if "police knew of the presence of the automobile and planned all along to seize it" when they arrested defendant in his home, then "there was no 'exigent circumstance' to justify their failure to obtain a warrant" and fruits of search must be suppressed); Chambers v. Maroney, 399 U.S. 42, 50-52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (holding that, based on automobile's ready mobility and "fleeting" opportunity to search, where officers have probable cause to search a car when it is initially stopped on the road it may also be searched without a warrant after it has been taken to the police station). In California v. Carney, 471 U.S. 386, 391-92, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), however, the Supreme Court articulated an additional justification for warrantless car searches, namely that a car's occupants enjoy a reduced expectation of privacy in their car compared to their home due to the extensive regulation of automobiles. Since Carney, the necessity of a special exigency has waned and is now satisfied by the mobility of the car itself.

**B.  The Test: Mobility of the Automobile and Probable Cause**

In United States v. Ross, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), the Supreme Court stated that if there was probable cause to search a vehicle, a warrantless search would not be deemed in contravention of the Fourth Amendment

9

if the facts of the case would have justified a warrant, "even though a warrant has not actually been obtained." In Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (per curiam), the Supreme Court repeated this rule and stated: "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Lastly, in Maryland v. Dyson, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (per curiam), the Supreme Court made it clear again that no special exigency is required beyond a showing of the mobility of the automobile.  Thus, for a warrantless search of an automobile to be constitutional, (1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime.  United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003).  Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances.  United States v. Tamari, 454 F.3d 1259, 1264 (11th Cir. 2006).

It is clear from the above case law that there are only two questions that must be answered in the affirmative before authorities may conduct a warrantless search of an automobile. The first is whether the automobile is readily mobile.  All that is necessary to satisfy this element is that the automobile is operational.  United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990).  There is no question that the Defendant's vehicle was readily mobile.  It had been driven to the meeting place and parked there shortly before TFO Manning seized Defendant's backpack.  Defendant drove a rental car to the

10

meeting with GDNA officers and was observed getting out of the drive's side of a rental car. Thus, it was movable; it was operational. "All that is necessary to satisfy this element is that the automobile is operational." Watts, 329 F.3d at 1286. Accordingly, the mobility of the automobile prong of the test has been satisfied.

The second element, probable cause, was also clearly established. "Probable cause . . . exists when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." U.S. v. Lindsey, 482 F.3d 1285 (11th Cir. 2007) (quoting Tamari, 454 F.3d at 1264). In this case, there was more than a fair probability that forged documents would be found in Defendant's car. Despite Defendant's arguments to the contrary, TFO Manning had probable cause to believe that Defendant's car and his backpack contained either contraband, evidence, instrumentalities, or fruits of crimes, including the crime with which Defendant is charged and for which he was arrested. These facts include: (1) A joint investigation revealed that Defendant, ordered thousands of Oxycodone, Hydrocodone, and other drugs, through the Chamblee Pharmacy, a pharmacy that never opened; (2) Defendant applied for a pharmacy license for Lillie RX; (3) GDNA and DEA's joint investigation led to the conclusion that the Defendant was the owner of both the Chamblee Pharmacy and the individual applying for the license for Lillie RX; (4) In response to Defendant's calls seeking his pharmacy license for Lillie RX, Special Agent Brosh sent Defendant a letter outlining documents Defendant needed to bring with him to get his pharmacy license for Lillie RX; (5) Defendant was observed getting out of a rental car and

11

standing in front of Lille RX; (6) TFO Manning observed an open Louis Vuitton backpack with papers in it on the front passenger seat of the rental car that Defendant exited minutes earlier; (7) TFO Manning believed that he had probable cause to seize the backpack because TFO Manning knew Defendant was supposed to be bringing documents with him to the meeting with GDNA; and (8) The GDNA and DEA investigation involved a substantial amount of forged documents, including forged documents from a business two doors down from Lillie RX.  All of these factors indicated that probable cause existed for the search of Defendant's car and the seizure of his backpack.

Defendant suggests that TFO Manning's testimony that he seized and searched the backpack because he had probable cause to do so is not credible.  In support Defendant contends that TFO Manning's DEA-6 does not mention probable cause or that the backpack was seized for evidence purposes and that the application and affidavit in support of the search warrant indicates that the backpack was seized from the rental vehicle incident to Defendant's arrest.  This Court, however, finds that although TFO may have thought the search and seizure was lawful pursuant to search incident to arrest and safekeeping exceptions, TFO Manning also believed he had probable cause to seize and search the backpack.  TFO Manning testified credibly that he knew Defendant would likely have evidence of a crime with him because Defendant was asked to bring documents with him to the meeting that was purportedly for the purpose of presenting what Defendant needed to get a pharmacy license.  In addition, TFO Manning knew that

Defendant had allegedly prepared forged documents in pursuit of his alleged illegal enterprise in the past. (Tr. 20-21).

Thus, the second element necessary for the application of the automobile exception, probable cause, has been shown. Because both elements of the automobile exception were satisfied, TFO Manning was authorized to conduct a warrantless search of Defendant' car.[1] Accordingly, Defendant's Motion to Suppress should be denied. Docket Entry [21].

## CONCLUSION

For the foregoing reasons this Court **RECOMMENDS** that Defendant's Motion to Suppress Evidence, including any statements Defendant may have made, be **DENIED**. Docket Entry [21]. There are no further motions or problems pending before the undersigned to prevent the scheduling of this case for trial. Therefore, this action is **CERTIFIED READY FOR TRIAL**.

**SO ORDERED, REPORTED AND RECOMMENDED** this 23rd day of December, 2013.

s/Linda T. Walker<br>
LINDA T. WALKER<br>
UNITED STATES MAGISTRATE JUDGE

---

[1] In view of this conclusion regarding the applicability of the automobile exception, it is not necessary to address the government's argument that the seizure of Defendant's bag was for safekeeping purposes and it was searched pursuant to DEA's inventory policy.

13

AO 72A
(Rev.8/82)